Brinkerhoff, J.
This ease turns entirely upon the constitutional validity of certain acts of the general assembly. I regret that my brethren have devolved on me the task of announcing the opinion of the majority of the court. It is one which I would have gladly avoided. No one doubts that it is the proper prerogative of the judiciary, under a written constitution, to pass upon the constitutionality of acts of the legislature, whenever the question arises in a case pending before it; and, if they be found to contravene the limitations imposed by the organic and fundamental law of the state, to hold and declare them null and void. If it were not so, indeed, written constitutions would be of little or no value; for, the legislature, being the sole judge of its own powers, would soon, become practically omnipotent. Nevertheless, the office is -one of great delicacy and responsibility, and by no moans to be *500 coveted. Of delicacy, because interests growing out of personal and party politics are frequently involved in such cases; and a judge, however upright and “ clear in his *great office ” he may be, can hardly expect to escape having his judgment censured, and his motives questioned. Of responsibility, because the judgment of the court may necessarily conflict with and overrule that of a coordinate branch of the government, which it is alike the pleasure and duty of the court to treat with great respect and sincere consideration. These sentiments of respectful consideration, however, have a limit to their practical operation; and that limit is found where official obligation and fealty to the constitution begin. And if, after full hearing and careful consideration of the question presented, a court is clearly satisfied that the legislature has, in any case, overstepped the limits of the constitution, it is its duty so to-hold; a duty which, however delicate and responsible, it is not at liberty to decline.
In the spirit of these sentiments, then — a sincere respect for the judgment of the legislature on the one hand, and a firm determination to preserve in their integrity the limitations of legislative power which the constitution has prescribed on the other — we have endeavored to consider and dispose of the question presented in the case, to which we now turn our attention.
Counsel for the defendants, in support of their right to exercise the powers and functions named in the information, cite two statutes, both passed April 12, 1858, the one being “ an act to provide for the more expeditious completion of the new state-house, prescribing the order in which it shall be done” (55 Ohio L. 122),and the other “ an act providing for the appointment and more thorough system of accountability of officers of the Ohio penitentiary, fixing their compensation, proscribing their duties, and determining the manner of working convicts ” (55 Ohio L. 136). The first and second sections of the former act are as follows: ¡
“Seo. 1. That a board shall be constituted, denominated the commissioners of the state-house, composed of three persons, to be appointed by William Kennon, Asaliel Medbery, and William B. Caldwell, under whose direction and authority the further prosecution of the work in the completion of the new state-house in the city of Columbus shall bo continued and carried on.
“Sec. 2. The said commissionrs of the state-house, so appointed, shall severally *hold their offices for the term of two years, and until their successors shall be duly appointed and qualified, un *501 less the new state-house shall bo sooner completed. And before entering upon the discharge of their duties, each of them shall take an oath or affirmation to discharge faithfully and diligently his duties. And in case any vacancy shall occur in said board, it shall be filled by the said William Kennon, Asahel Medbery, and William B. Caldwell. And in the appointment of the commissioners of the state-house, one of the commissioners shall be designated as the president and acting commissioner of the board.”
The first section of the latter act is as follows:
11 That there shall be appointed by William Kennon, Asahel Medbery, and William B. Caldwell, or a majority of them, three directors of the Ohio penitentiary, two of whom at least shall reside in the city of Columbus, and one of whom shall hold his office for the term of one year, one for the term of two years, and one for the term of three years, and until their successors are elected and qualified; but no person shall be eligible to the office of director who is a contractor in the penitentiary, or interested, directly or indirectly, in a,ny branch of business carried on in said institution. And should any director become, ether directly or indirectly, interested in any business carried on in said institution during his term of office, it shall be good cause for his removal; or for other cause, which, in the opinion of the said William Kennon, Asahel Medbery, and William B. Caldwell, or a majority of them, may be sufficient, the said William Kennon, Asahel Medbery, and William B. Caldwell, or a majority of them, are hereby authorized and required to remove such directors; which removal, and the reasons therefor, they shall cause to be entered upon the journals of the penitentiary, and shall report the same to the next session of the general assembly. The said directors first appointed under this act to hold their offices according to the rotation in which their names are placed— the first named for one year, the second for two years, and the third for three years, respectively — each of whom, before entering upon the duties of his office, shall take and subscribe an oath or affirmation to support the constitution of the United States and of the State of Ohio, and to faithfully and diligently discharge the duties of such director. In case of a vacancy in said board of directoi’S, by death, resignation, or otherwise, the same shall be filled by William Kennon, Asahel Medbery, and William B. Caldwell, or a majority of them,” etc.
Now, if these are valid acts of legislation-, they give ample authority to the defendants to exercise all the powers and functions which the information represents them as usurping. But, it is contended in behalf of the state, that these acts of legislation aro invalid, because in violation of the prohibition of any exercise of *502 the appointing power by the general assembly, embraced in the-*twenty-seventh section of the second article of the constitution, and which is as follows:
“ The election and appointment of all officers, and the filling of all vacancies not otherwise provided for by this constitution, or the constitution of the United States, shall be made in such manner as may bo directed by law; but no appointing power shall be exercised by the general assembly, except as prescribed in this constitution, and in the election of United States senators; and in these cases-the vote shall be taken ‘ viva voce.’ ”
The phrase “appointing power,” as here used, is one of no ambiguous signification. When employed in reference to matters pertaining to government, or to the distribution of the powers of government, it means the power of appointment to office — the-power to select and indicate by name individuals to hold office, and to discharge the duties and exercise the powers of officers. No man can possibly mistake its meaning in this respect, especially as office, and the appointment and election of officers, constitute-the whole and the maifest subject-matter of this section of the-constitution.
The first question which arises, then, in considering whether the-power here assumed by the legislature is within the prohibition of this section of the constitution, is this :
Do the powers and duties devolved on the defendants by the sections of the acts above quoted, constitute them officers or not?
What is an office? Among lexicographers, Webster defines the word to signify “ a particular duty, charge, or trust conferred' by public authority and for a public purpose.” In a case in 20 Johns. 492, Platt, J., delivering the opinion of the court, defines the legal meaning of the word to be, “ an employment on behalf of the government, in any station or public trust, not merely transient, occasional, or incidental.”
If we accept either or both of these definitions as substantially correct, it is clear to our minds, that if these statutes are hold valid, those defendants are officers. Theirs is a public duty, charge, and trust, conferred by public authority, for public purposes of a very weighty and important character. Their duties, their chargo and trust, are not transient, occasional, or incidental, but durable, permanent, and continuous.
*503 *In the exercise of the powers of appointment, supervision, and removal, attempted to be conferred by these statutes, the defendants might exert an indirect but efficient control over the disbursement of large appropriations of money, and wield an extensive patronage of honor and emolument.
In respect to the commissioners of the new state-house, their power of appointment and filling vacancies continues for two years at least; and in respect to the directors of the penitentiary, if we go upon the respectful supposition that this legislation is designed to be, as all wise and decent legislation ought to be, permanent and durable, and is not a mere temporary party expedient, it is apparent that their powers of removal from office at their unrestricted will, and of filling such vacancies as may happen, or as they may themselves create, are vested in them for life; which is a permanency of official tenure otherwise unknown to the constitution and laws of Ohio. I say for life; for the statutes prescribe no limit of time beyond which the powers and duties of these defendants shall not extend; and if these acts be valid, death or subsequent legislation only can terminate them.
The positions of commissioners of the state-house, and of directors of the penitentiary are offices, distinctly declared to be so, and created as such by law. This is not denied. Now, according to the terms of these acts, the defendants may select an individual citizen, and by their act of appointment, transform him from a private citizen into an officer of high powers and responsibilities. The officer is made such by the creative fiat of the defendants; and in the case of a director of the penitentiary, the same power that made can unmake. Now, is the creator less than the creature ? Is the latter an officer, while the former falls short of that dignity — when both are invested with important trusts by public authority, for public purposes, and when both are designated by appointment and not by election ?
It is true, the general assembly seems to have carefully avoided giving to the defendants any official name or designation. But surely this is immaterial to the question. The official or unofficial character of the defendants is to be determined, not by their name, nor by the presence or absence of an official designation, *but by the nature of the functions devolved upon them. If the general assembly had in terms enacted “that a board of commissioners of the appointing power, to consist of three members, be and is hereby *504 constituted, and that William Kennon, Asahol Medbery, and William B. Caldwell be and hereby are respectively appointed to the office of member of such board,” and had then proceeded to clothe them with precisely the same powers and charge them with the same public trusts which are committed to them by the terms of the acts quoted, we presume no one would deny that they would be officers, if the act was one of constitutional validity. Certainly they would then be called officers, and would have an official name. Yet if we look at the substance of things, where is the difference between the actual enactment and the one supposed? There is none whatever. Surely, these men are not mere private electors; they are something more — much more; and the mere fact that their functions are nameless can not alter the case.
But, it is said, the acts referred to prescribe no oath of office, and it is thence inferred that the defendants can not be officers. To this it may be replied that tho constitution does prescribe an oath of office, and that its injunctions are as obligatory as those of a statute could be. At all events, the utmost that such omission can effect, is to show an instance of legislative neglect or oversight. That the ■defendants ought to have taken an oath of office before entering upon the discharge of official duty, is clear.
Again, it is said that no fees, salary, or other compensation, is annexed to the discharge of the duties devolved by statute upon these defendants. This is true; and it is also true that coanpensation to them hereafter is nowhere by these statutes prohibited or precluded. That they shall not herehftcr receive any compensation for services by them rendered and expenses incurred under those acts, is nowhere made a condition of their acceptance of the trusts reposed in them. There is nothing to prevent their applying to the legislature for compensation, nor to prevent the legislature from awarding it. Indeed, upon every principle of general equity or morality on which legislative ^bodies are accustomed to proceed, in the allowance of claims against the state, if this legislation wore valid, they ought to receive a fair compensation for their time and expenses.
That compensation or emolument is a usual incident to office is well known ; but that it is a necessary element in the constitution of an office, is not true. It is not named in either of the definitions above referred to, and if it had been, facts would show the contrary. George Washington not only received no pay as commander-in-chief of the continental armies during the war of our *505 revolution, but accepted the position on the express condition prescribed by himself, that he should receive none. 7 Bancroft, 401, 402. The members of the British Parliament do not receive, and for more than a century have not received, any pay whatever. 1 Bla. 174, note 42. And it will hardly be contended that these .are not offices.
How far the general assembly may go in constituting temporary agencies and commissions for temporary, incidental, transient, or •occasional purposes, and in designating the persons who are to execute them, without thereby creating an office and appointing an -officer, are not questions before us. The question which is before us imposes responsibilities sufficiently onerous; and we wish to •confine ourselves to it alone. But we are clear that if this legislation is valid, then these defendants are officers — the holders of office; and, having been appointed by the general assembly, and their appointment being an “ exercise of the appointing power by the general assembly,” their appointment is unconstitutional and void unless their appointment by the general assembly is “ prescribed by the constitution,” and they are thus brought within the •exception to the general prohibition.
And this brings us to the second inquiry involved in the questions before us. Are these offices within the exception to the general prohibition ? or, in other words, is the appointment of these -officers by the general assembly “ prescribed by the constitution ?”
The office claimed by these defendants is nowhere specifically mentioned or described in the constitution. That instrument is silent in respect to any such office. How then can it “ prescribe ” *to the general assembly the power and duty to fill such office by appointment? It can not, and does not, so prescribe. The •constitution does prescribe that each house of the general assembly shall “ choose its own officers,” and that the senate shall, by way of “ advice and consent,” participate, pro tanto, with the governor in the appointment of trustees of the benevolent institutions of the s a e. These acts are and may be done by the houses of the general assembly as component parts of that aggregate body, though not by the general assembly in its entire and aggregate character. Tnesearothe only appointing powers “prescribed by the constitution ” to the general assembly; and, with the election of United States senators, mark out and define the limits of the exception to the general prohibition.
*506 But tbe first clause of the second section of the seventh article-of the constitution, is cited as a grant of power to the general assembly to make these appointments, and as enlarging the limits of the exceptions to the general prohibition above named.
That section is as follows :
“ Sue. 2. The directors of the penitentiary shall be appointed or elected, in such manner as the general assembly may direct; and the trustees of the benevolent and other state institutions, now elected by the general assembly, and of such other state institutions as may hereafter be created, shall be appointed by the governor, by and with the advice and consent of the senate ; and upon all nominations made by the governor the question shall be taken by yeas- and nays, and entered upon the journals of the senate.”
To make good this claim it must be made to appear that the power to direct the “ manner,” the mode, the way in which an act shall be done, and the power and authority to do the act itself, are one and the same thing. But that they are not identical or equivalent to each other, is too clear for argument, and almost too clear to admit of illustration. To prescribe the manner of election or appointment to an Office is an ordinary legislative function. To make an appointment to office is an administrative function. And-under a constitution in which the philosophical theory of a division, of the powers of government into legislative, executive, and judicial, should be exactly carried out in detail, the power of prescribing the manner of making ^appointments to office would fall naturally and properly to the legislative department; while the-power to make the appointments themselves would fall as naturally and properly to the executive department. This exact adherence to theory, however, is seldom if ever found in any frame of government; and we refer to the distinction simply by way of reply to-the claim, on behalf of defendants, in argument, that the power to prescribe the manner of appointments includes the power of appointment itself, and to show that they are acts and powers wholly different and distinct from each other.
IIow far the general assembly may go, and just what it may or may not do, in the exercise of the power here conferred to direct the manner of the election or appointment of directors of the penitentiary, are questions not before us. We have not considered them, nor do we intend to attempt to answer them. It will be time- *507 enough, to do so, when they are presented in a case actually pending before us. But conceding, for the sake of the argument, that, it would be competent for the legislature to constitute a board of commissioners, to hold office during life even, for the appointment, of directors of the penitentiary, it is clear that the legislature can-, not, under the constitution, itself appoint and designate the members of such board. They must be either elected by the people of the state, or appointed by some constitutional agency other than> the general assembly.
This clause of the second section of the seventh article of the constitution, then, is in no way inconsistent, or in conflict, with the-provisions of the twenty-seventh section of the second article, but is in entire harmony with it. It in no way qualifies or enlarges-, the exceptions to the general prohibition of any appointing power-by the general assembly therein contained, but leaves that prohibition to operate, with full force and effect, upon the appointments in. question.
The clause of article 7, section 2, that “the directors of the penitentiary shall be appointed or elected in such manner as the general assembly may directand that of article 2, section 27, that “ the election and appointment of all officers, and the filling of all vacancies-not otherwise provided for by this constitution, or the *constitution of the United States, shall be made in such manner as may be-directed by law,” are equivalent to each other. When the legislature “ directs,” it directs by law. Its appropriate voice is the voice of law. The prohibition attached, by way of proviso, expressly to the one, applies equally to both, and is no more in conflict with the one than with the other.
But, it may be asked, what then is the use of the latter clause?— what is its office in the constitution ? I reply, none whatever. It was regarded as a mere redundancy by some of the members of the-constitutional convention, at the time it was under consideration, there. Its introduction into the constitution, however, is readily accounted for by reference to what appears in the debates, vol. 1, 539, 540. The different articles of the constitution were the work,, 'originally, of different committees, which came before the convention as reports from such committees respectively. The line of demai’kation between the subjects of' consideration properly devolving: upon these committees, respectively, not being always plain and distinct, their reports occasionally overlapped upon each other, and *508 ■the redundancies thus arising were sometimes increased by amendments made in convention. Such was the case in respect to these • clauses of the constitution. Article 2, section 27, was the work originally of the committee on the legislative department; article 7,section 2, was reported by the committee on public institutions. The latter, as originally reported, gave the appointment of directors of the penitentiary, as well as that of trustees of the benevolent institutions of the state, exclusively to the governor and senate ; and, in convention, it was amended so as to read as it now stands in the constitution. The amendment was adopted, as is apparent from the debates, to qualify the appointing power conferred on the executive by the original report, and to enable the general assembly to provide for the filling of the office of director of the penitentiary, either ■by election or by appointment, at its discretion.
We conclude, therefore,
1. That the selection and designation, by name, of the defendants, by the general assembly, to exercise continuously, and as a part of the regular and permanent administration of the govern*ment, important public powers, trusts, and duties, is an appointment to office.
2. That these appointments are clearly prohibited to the general .assembly by the constitution, are not within any exception to such prohibition, and are, therefore, null and void.
Thus far we have reasoned mainly from the terms of the constitution, and have derived our conclusions from what appears upon the face of that instrument. But if, departing from these, we look into the debates of the convention which framed the constitution ; into the history there afforded of the section of the constitution under which the great question in this case arises ; into the intentions of the framers of the constitution as expressed in debate; into the discussions before the great constituent body, the people, pending the question of the adoption of the constitution, after the convention had completed its labors; and into the mischiefs arising under oqr former constitution, and intended to be remedied by the section in question of the new one, we shall find abundant confirmation, and, it seems to me, demonstrative evidence, of the correctness of the view we have taken, and of the conclusions at which we have arrived.
1. As to the history of section 27, article 2. In the report to the ■convention by the committee on the legislative department, this *509 section originally stood thus: “ The appointment of all civil officers not otherwise directed by this constitution, shall be made in such mariner as-may be directed by law; provided, however, that no appointing power shall ever be vested in or exercised by the general assembly the prohibition being without any exception whatever. 1 Debates, 164. Subsequently (Id. 259), Mr. Stidger moved to amend this section by adding the words, “ except the appointment. of the officers of their own body.”
It was argued in convention then, as it is argued in this ease ■ here, that such exception was unnecessary, inasmuch as the general assembly in its aggregate capacity did not appoint officers of its own body. But the argument was unsatisfactory to the *convention, and, to avoid all question on the subject, the amendment was adopted, together with another amendment moved by Mr. Reemelin, so that the section.then read as follows:
“ The appointment of all civil officers, not otherwise directed by this constitution, or the constitution of the United States, shall be made in such manner as may be directed by law ; provided, however, that no appointing power shall ever be vested in, or exercised by the general assembly, except the appointment of officers of their own body.” 1 Id. 260.
This was while the convention was sitting in committee of the whole. Afterward, the amendments aforesaid having been reported to the convention by the committee of the whole, the same were there adopted without further amendment. 2 Debates, 164. Subsequently (Id. 286), the report on the legislative department, with pending amendments, was recommitted to the committee which reported it. The matter being reported back without substantial change (Id. 318), and various unimportant verbal amendments made (Id. 318, 319, 568, 569), the same was engrossed (Id. 633), referred to a select committee of one, reported back without amendment, and then passed, and referred to the committee on revision, arrangement, and enrollment. Id. 662, 664.
Thus at the time when that which is now section 27 of article 2 of the constitution was agreed on in convention, and was referred to the committee on revision, arrangement, and enrollment, the only exception to the general prohibition of all appointing power to the general assembly was embodied in these words: “Except the election of officers for their own body, and United States senators.”
*510 The duties of that committee are indicated by its name. They ■■were of a literary and clerical character. To initiate constitutional ¡provisions was no part of its proper office. But it took, on reference, what had been previously agreed on, after full discussion in ‘Committee of the whole and in the convention proper, and arranged the subject-matter under appropriate heads, revised and corrected the language, and attended to its enrollment. That committee, without any further discussion or action by the convention, reported back the report on the legislative department *in the precise language in which it appears as article 2 of the constitution ; and, without discussion, amendment, or proposition to amend it, in any way, it was ordered to be enrolled. Id. 832, 833.
There can be no doubt, we think, that the change of phraseology in this section, reported by the committee on revision, from “ except in the appointment of officers of their own body,” to “ except as prescribed in this constitution,” was designed simply to ■cover and include the quasi power of appointment in the senate, in the way of confirmation of executive nominations.
It seems to me hardly possible that the report of the committee ■on revision should have been thus finally adopted without remark, amendment, or attempt to amend, unless that committee and the ■convention had alike understood the report to be at least the subastan tial equivalent of what had before been settled in convention.
From this history of the section in question, it is apparent, beyond controversy, that the convention, in its adoption, understood the exception to extend no further than to the election of their ■own officers by the two houses of the general assembly, the power of confirmation by the senate, and the election of United States •senators.
2. This is also apparent from what was said by members in debate. Mr. Eeemelin, though not the chairman of the committee ■on the legislative department, was understood to have drawn up its report; and on him was largely devolved the task if its explanation and defense. It was matter of objection and complaint, ■on the part of several members of the convention, that there was •an undue distrust of the legislature manifested by the committee in its report, and that it had been too stringent in the restriction of its powers of patronage and appointment. Yet, in the face of those objections and complaints, he expressly declared the purpose of the committee to be, “that no appointing power — not *511 the least vestige — would be left to the general assembly.” 1 Debates, 259. And with these open and undisguised declarations as to its purpose and object, his report was, in this respect, adopted, with no other than merely verbal amendments, or such *as were intended to guard against possible conclusions never contemplated by the committee itself.
3. The constitutional convention closed its labors on the 10th day of March, 1851; and the question as to the adoption or rejection of the constitution it had framed, was submitted to a vote of the people on the 17th of June following. Pending the question upon the adoption of the new constitution, and while it was under discussion before the people, how was the matter before us then regarded? In reply, I hazard nothing in saying, that among the most prominent reasons, on the ground of which the adoption of the new constitution was urged and advocated, was this : that, by its provisions all political patronage whatsoever, through the medium of appointments to office, except as before mentioned, was taken from the legislature. This single provision, in view of the evils it was intended to remedy, and the virtues it was designed to beget, probably attracted to the support of the proposed constitution thousands of votes which would otherwise have been withheld. In proof of this, in is necessary but to appeal to the memory of living men, and to refer to the journ'als of that day.
The existence of legislative patronage was a prominent mischief, inducing the calling of a constitutional convention. The annihilation of such patronage was a leading remedy aimed at by it. With or without foundation, it was generally believed that a practice had grown up, among members of the legislative bodies, to barter votes for offices in exchange for votes for laws, and votes for laws in exchange for votes for offices; thus corrupting the streams of legislation at the fountain-head. And it was sought by the convention and the people, by means of the broad and sweeping prohibition contained in the 27th section of the second article of the constitution, to keep the sources of law pure; to place an impassable barrier between the legislature and even the temptation to corrupt or unworthy action; and to confine it to its single, and legitimate, and highly honorable function — the passage of general, well considered, and durable laws, for the promotion of the permanent well-being of the people. If this decision, by preserving the integrity of tin; constitution, in so important *512 *a particular, and enforcing the clear and manifest intentions of those who framed and those who adopted it, shall tend in-any degree to those ends, we shall be amply compensated for any censure which the irritation consequent upon personal or partisan disappointments may occasion.
The demurrer to the information is overruled ; and, counsel for the defendants not desiring leave to answer, a judgment of ouster will be entered.